## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

JAY ALAN ROLLEFSON,

           Plaintiff,

vs.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

           Defendant.

No. C13-3062-LTS

**MEMORANDUM OPINION
AND ORDER**

———————————

Plaintiff Jay Alan Rollefson seeks judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying his application for Social Security Disability benefits (DIB) and Supplemental Security Income benefits (SSI) under Title II and Title XVI of the Social Security Act, 42 U.S.C. § 401 *et seq.* (Act). Rollefson contends that the administrative record (AR) does not contain substantial evidence to support the Commissioner's decision that he was not disabled during the relevant period. For the reasons that follow, the Commissioner's decision will be affirmed.

## I.    *BACKGROUND*

Rollefson was born in 1966 and has past relevant work as a fast food cook and cashier. AR 384. He protectively filed an application for DIB on January 14, 2011, and filed an application for SSI on January 26, 2011, alleging a disability onset date of January 7, 2011. AR 175-76, 181-87. He alleges disability due to depression, poor circulation in his legs, social anxiety, hearing loss and hyperthyroidism secondary to Graves' disease. AR 89-98, 290. His claim was denied initially and on reconsideration. AR 111-14, 120-24. Rollefson then requested a hearing before an Administrative Law Judge

(ALJ), which was held on April 17, 2012, before ALJ Thomas M. Donahue. AR 38-85. During the hearing, Rollefson and a vocational expert (VE) testified. *Id.* On May 18, 2012, the ALJ issued a decision denying Rollefson's claim. AR 18-30. Rollefson sought review of this decision by the Appeals Council, which denied review on September 27, 2013. AR 1-6. The ALJ's decision thus became the final decision of the Commissioner. AR 1; 20 C.F.R. § 416.1481.

On November 25, 2013, Rollefson filed a complaint (Doc. No. 2) in this court seeking review of the Commissioner's decision. On January 14, 2014, with the parties' consent (Doc. No. 6), the Honorable Mark W. Bennett transferred this case to me for final disposition and entry of judgment. The parties have briefed the issues and the matter is now fully submitted.

## II.    *DISABILITY DETERMINATIONS AND THE BURDEN OF PROOF*

A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505, 416.905. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520, 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). First, the Commissioner will consider a claimant's work activity.

If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b). These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Id.* §§ 404.1521(b)(1)-(6), 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141, 107 S. Ct. 2287, 2291 (1987). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity (RFC) to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1545(a)(4), 416.920(a)(4)(iv), 416.945(a)(4). "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his or her age, education, and work experience. *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n.5 (8th Cir. 2000). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the

claimant is not disabled.  If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  At Step Five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant.  *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

## III.    ALJ'S FINDINGS

The ALJ made the following findings:

(1)    The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.

(2)    The claimant has not engaged in substantial gainful activity since January 7, 2011, the alleged onset date (20 CFR 404.1571 *et. seq.*, and 416.971 *et seq.*).

(3)    The claimant has the following severe combination of impairments: major depression;  anxiety disorder; diabetes mellitus, type II; bilateral lower extremity edema secondary to varicose veins; hearing loss; and hyperthyroidism secondary to Graves' disease (20 CFR 404.1520(c) and 416.920(c)).

(4)    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d),    404.1525,    404.1526,    416.920(d), 416.925 and 416.926).

(5)    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) involving lifting 35 pounds occasionally and 15 pounds frequently; sitting two hours at a time for six for an eight hour day; walking one-half block; only occasional climbing of ramps or stairs; only occasional climbing ladders, ropes or scaffolds; occasional stooping, kneeling, crouch, crawling, bending; would

need a low stress level job, such as a level 4, with 10 being the most stressful and 1 being the least stressful; no contact with the general public and limited contact with fellow workers; avoid concentrated exposure to noise; and no working at heights.

(6)     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

(7)     The claimant was born on July 24, 1966 and was 44 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date. The claimant subsequently changed age category to a younger individual age 45-49 (20 CFR 404.1563 and 416.963).

(8)     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

(9)     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

(10)    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 415.969 and 416.969(a)).

(11)    The claimant has not been under a disability, as defined in the Social Security Act, from January 7, 2011, through the date of this decision (20 CFR 416.920(g)).

AR 20-30.


## IV.     THE SUBSTANTIAL EVIDENCE STANDARD

The Commissioner's decision must be affirmed "if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir.

2006); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion." *Lewis*, 353 F.3d at 645. The Eighth Circuit explains the standard as "something less than the weight of the evidence and [that] allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

In determining whether the Commissioner's decision meets this standard, the court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Wester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). The court considers both evidence which supports the Commissioner's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Sec'y of Health & Human Servs.*, 879 F.2d 441, 444 (8th Cir. 1989). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record de novo." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the [Commissioner's] denial of benefits." *Kluesner*, 607 F.3d at 536 (quoting *Finch v. Astrue*, 547 F.3d 933, 935 (8th

7

Cir. 2008)). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson*, 30 F.3d at 939 (quoting *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984); *see Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005) ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion.").

## V.  DISCUSSION

Rollefson argues the ALJ's decision is not supported by substantial evidence for the following reasons:

        1.     The ALJ improperly evaluated Rollefson's credibility.

        2.     The ALJ did not properly consider a vocational evaluation.

        3.     The ALJ improperly relied on the VE's testimony.

I will discuss these issues separately.

### 1.  The Credibility Evaluation

The ALJ noted that Rollefson alleges "an inability to work due to depression; poor circulation in the legs; social anxiety; hearing loss; and overactive thyroid." AR 23. The ALJ then discussed the evidence of record and concluded that Rollefson's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not fully credible to the extent they are inconsistent with the above [RFC] assessment." AR 27. Rollefson argues that the ALJ did not properly evaluate the credibility of his subjective allegations and "gave a very minimal analysis" of the relevant factors. Doc. No. 10 at 19. Specifically, he contends that the ALJ failed to consider the observations of others, such as his treating physicians and psychotherapist, his brothers,

the vocational rehabilitation counselors and examiners[1] and the Social Security Administration (SSA) employee who conducted his application interview. He also contends that the ALJ misconstrued his daily activities, the likelihood of work aggravating his impairments, the effectiveness of his treatment and medications, and his functional restrictions.

In assessing the claimant's subjective allegations, the ALJ must consider all of the evidence relating to the subjective complaints, including observations by other parties and treating or examining physicians regarding "(1) the claimant's daily activities; (2) the duration, frequency, and intensity of pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions." *McDade v.* Astrue, 720 F.3d 994, 998 (8th Cir. 2013) (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)). The ALJ does not have "'to discuss methodically each *Polaski* consideration, so long as he acknowledge[s] and examine[s] those considerations before discounting [the claimant's] subjective complaints.'" *Steed v. Astrue*, 524 F.3d 872, 876 (8th Cir. 2008) (quoting *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000)). The ALJ's credibility determinations are entitled to deference if "they [a]re supported by good reasons and substantial evidence." *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006). Thus, credibility determinations are primarily to be made by the ALJ, not by the courts. *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001).

I will address each factor Rollefson relies upon to challenge the ALJ's assessment of his credibility.

### a. *Treating Source Evidence*

Rollefson contends that the ALJ erred in evaluating evidence from his treating mental health professionals. The ALJ summarized evidence concerning two of those

---

[1] I will address the ALJ's consideration of the vocational rehabilitation report in Section V(2), *infra*.

professionals, Raymond Lang, Jr., LISW, and Rogerio Ramos, M.D. AR 26-27. He noted that Rollefson's mental health status had declined in April 2011 "due to increasing financial problems and recent physical health problems related to thyroid treatments." *Id.* However, he found that by August 2011, Rollefson "reported feeling much better and felt the 'mental fog' he had been experiencing had lifted, especially following better control of his thyroid condition." AR 27. The ALJ further observed that treatment notes in February 2012 "continued to reflect improvement." *Id.* He concluded that while Rollefson experienced a temporary decline in functioning due to thyroid treatment and "social stressors over financial concerns and lack of employment," those limitations "were not sustained over a consecutive twelve month period."[2] *Id.*

"It is inherent in psychotic illnesses that periods of remission will occur and that such remission does not mean the disability has ceased." *Andler v. Chater*, 100 F.3d 1389, 1393 (8th Cir. 1996) (internal citation and quotation marks omitted). "'Proper evaluation of [mental] impairment must take any variations in level of functioning into account in arriving at a determination of impairment severity over time.'" *Id.* (quoting 20 C.F.R. Pt. 404, Subp't P, App. 1, § 12.00(D)). Here, the record supports the ALJ's finding that the serious mental impairments Rollefson experienced in early 2011 did not persist for at least twelve months.[3]

In his notes of many sessions with Rollefson prior to August 2011, Lang indicated that Rollefson had difficulty communicating, had impaired memory, concentration and attention, and was confused and anxious. AR 489, 516, 572. After August 2011, Lang

---

[2] As noted earlier, the Act's definition of "disability" includes a requirement that the impairment "can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

[3] Rollefson contends that the ALJ failed to consider Lang's treatment notes properly by citing to numerous entries in Lang's notes to show that Rollefson had a marked impairment in communication, concentration, thinking, and overall functioning. Doc. No. 10 at 19-20. However, all of the sessions cited took place before August 2011.

consistently reported that Rollefson's speech, thinking, memory, concentration and attention had improved to within normal limits. AR 573-74, 576, 578. During some of these later sessions, Rollefson reported being confused and having difficulties in thinking and problem solving, but Lang observed that Rollefson's "[t]hinking appeared to be goal-oriented and logical without evidence of a thought disorder" and his attention and concentration within normal limits. AR 573-74.

The ALJ noted that Rollefson's cognitive complaints appeared to be associated with his thyroid problems and situational stressors, such as financial difficulties and continued unemployment. AR 27. During the hearing, Rollefson testified that the thyroid issues "definitely made it worse for my thinking." AR 53. The medical evidence and treatment notes support this conclusion, as well. *See, e.g.*, AR 504-05 ("[Rollefson] presents to the ER with chronic low mood, worse since onset of Graves. . . ."); AR 573 (noting "client's ongoing effort to limit the effects of his depressive symptoms and impairment due to his dysfunctional Thyroid"); AR 514-15 (noting Rollefson's depression symptoms, employment losses and financial difficulties). The ALJ attributed Rollefson's mental health improvement to treatment of his overactive thyroid and adjustment of his psychotropic medications. *Id.*

Treatment notes indicate Dr. Ramos (along with Scott Gibbs, P.A.), also saw improvement in Rollefson's condition over time. After an examination on February 9, 2011, Dr. Ramos reported that Rollefson's mood and affect were anxious. AR 519. Dr. Ramos also noted anxious mood and affect following an increase in thyroid functioning issues during a July 20, 2011, examination. AR 581. Rollefson received additional treatment for his thyroid in early September 2011 (AR 607), but had some lingering mental health symptoms. *See* AR 582 ("His mood was depressed, affect was flat."). Gibbs changed Rollefson's psychotropic medication at the September 15, 2011, appointment. AR 582-83. At the next medication review on January 26, 2012, Rollefson remarked to Gibbs that the medication change "has been very effective," and he felt "'I don't have the depression anymore.'" AR 584.

The ALJ did not err in discounting Lang's statements about Rollefson's inability to engage in competitive work.[4]  On April 15, 2011, Lang wrote a letter on behalf of Rollefson, noting that Rollefson's "prognosis is poor." AR 529.  As the ALJ noted, this statement was made during an exacerbation of symptoms when Rollefson was hospitalized for mental health symptoms and diagnosed with diabetes.  AR 635-36.  Despite the subsequent improvement in Rollefson's mental state, Lang cautioned Rollefson in February 2012 that his mental state was still fragile and that he should seek a job with minimal hours and low stress.  AR 578.  However, substantial evidence supports the ALJ's finding that Rollefson's mental health improved substantially and this improvement was attributable to treatment of his other medical conditions and also to new psychotropic medications.  *See* AR 26-27, 496, 578, 581, 584.  "If an impairment can be controlled by treatment or medication, it cannot be considered disabling." *Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004) (citation omitted).  The ALJ did not err in concluding that Rollefson's treating source evidence is inconsistent with his allegation of disabling impairments.

### b.    *Third-Party Statements*

Rollefson contends the ALJ failed to consider the statements of others.  Doc. No. 10 at 19-20.  While the ALJ is "not required to accept all lay testimony . . . it is almost certainly error to ignore it altogether." *Willcockson v. Astrue*, 540 F.3d 878, 881 (8th Cir. 2008); *accord Smith v. Heckler*, 735 F.2d 312, 316-17 (8th Cir. 1984) (finding that ALJ's failure to mention three lay witnesses' affidavits suggested that the ALJ overlooked them).  However, the ALJ may discount third-party testimony on the same grounds as he or she discounts a claimant's own testimony.  *Black v. Apfel*, 143 F.3d 383, 387 (8th Cir. 1998).  In fact, "the failure to discuss lay witness credibility is not reversible error in cases in which the ALJ made an express credibility determination of the plaintiff, and

---

[4] The ALJ included a limitation in the RFC for low stress jobs.  AR 22.

the evidence leading the ALJ to discredit the plaintiff's testimony also discredits the third-party testimony." *Roberts v. Astrue*, No. 1:11-CV-75 (CEJ), 2012 WL 3939960, at *5 (E.D. Mo. September 10, 2012); *accord Buckner v. Astrue*, 646 F.3d 549, 559-60 (8th Cir. 2011) (finding ALJ's failure to explicitly address observations of claimant's girlfriend did not require remand when the observations were identical to claimant's statements and ALJ discounted credibility of claimant). Moreover, failure to specifically discuss and cite evidence does not mean that it was not considered by the ALJ. *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) (citation omitted).

Rollefson contends the ALJ failed to properly consider his brothers' statements regarding his limitations and impairments. Doc. No. 10 at 20. The ALJ addressed a January 28, 2011, function report from one of Rollefson's brothers, Jon Rollefson. AR 24, 297-304. Specifically, the ALJ discussed Jon's statements concerning Rollefson's pain from gout, poor leg circulation and dislocated knee caps, as well as his hearing loss and "'cloudiness' of mind and short-term memory loss [that] made it difficult for [Rollefson] to be dependable and on task." AR 24, 297. The ALJ also referenced Jon's statements about Rollefson's poor personal care habits and the prior use of a conservator. The ALJ noted that according to Jon, despite Rollefson's alleged social anxiety, he still visited with friends, looked for employment and attended church, sporting events and family gatherings, which is consistent with Rollefson's own statements about his daily activities. AR 24, 62-63, 318-334.

The ALJ did not err in discounting Jon's statements regarding knee pain, hearing loss and swelling due to poor leg circulation because the ALJ properly discredited the Rollefson's own statements about the severity of those impairments. Rollefson's knee pain was managed by conservative treatment and therefore was not disabling. *See* AR 25; *see also Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (finding conservative medical treatment is an appropriate credibility factor). His swelling and hearing loss had been at the same level for some years, during which Rollefson engaged in substantial

gainful activity.  *See Banks*, 258 F.3d at 825.  Finally, Rollefson's memory and concentration improved following thyroid treatment and new medications.

Nor did the ALJ err in failing to specifically discuss the February 26, 2010, function report from Joel Rollefson.  Joel's statements paralleled Jon's, which the ALJ did address.  *See* AR 273-280 (noting Rollefson's limited social skills, appointment of conservator, difficulty interacting with supervisors, slower pace in tasks and physical impairments related to swelling and hearing loss).  Because the ALJ addressed and discounted Rollefson's own statements, and those of Jon Rollefson, it was not error for the ALJ to fail to separately address Joel Rollefson's cumulative statement.  *See Buckner*, 646 F.3d at 559-560.  As noted above, the failure to specifically discuss an item of evidence does not mean it was not considered.  *See Wildman*, 596 F.3d at 966.

Finally, Rollefson contends the ALJ erred by failing to consider the observations of the Social Security Administration (SSA) employee who conducted his application interview on January 21, 2011.  The employee noted Rollefson had difficulties in hearing, coherency and answering but did not note any difficulty in understanding or concentrating.  AR 287.  The employee also noted, "[Rollefson] was very slow in answering and hesitated with every answer."  *Id*.  The ALJ did not err in failing to discuss the observations of the SSA employee.[5]  Having discredited similar statements by others, the ALJ was not required to explicitly discuss a similar third-party observation.  *See Long v. Colvin*, No.12-04131-CV-C-REL-SSA, 2014 WL 856594, at *10-11 (W.D. Mo. March 5, 2014) (citing *Buckner*, 646 F.3d at 559-60) (finding ALJ did not err in failing to include SSA employee's observations when ALJ reviewed the entire record and the employee's observations were inconsistent with other credible evidence in the record).

_____

[5] At most, the ALJ's failure to discuss the employee's observations is harmless error since other evidence in the record also set forth the same alleged impairments that the ALJ subsequently discredited.  *See Hickey v. Social Sec. Admin.*, No. 4:07CV3111, 2008 WL 4065182, at *10 (D. Neb. Aug. 22, 2008) (finding ALJ's failure to discuss observations from Social Security Administration employee was harmless when some of the observations contradicted claimant's testimony and other observations were similar to those from treating sources).

### c.    *Daily Activities*

Rollefson contends the ALJ exaggerated his daily activities and improperly relied on these alleged exaggerations to find that he is not disabled.   Doc. No. 10 at 21-22.   In particular, Rollefson objects to the ALJ's characterization that he engages in certain activities on a daily basis and the ALJ's failure to acknowledge that Rollefson must take frequent breaks between activities.   *Id.* at 21.

Generally, "a person's ability to engage in personal activities such as cooking, cleaning or a hobby does not constitute substantial evidence that he or she has the functional capacity to engage in substantial gainful activity."   *Singh v. Apfel*, 222 F.3d 448, 453 (8th Cir. 2000).   Thus, a person does not have to be "'bedridden or completely helpless to be found disabled.'"   *Reed v. Barnhart*, 399 F.3d 917, 923 (8th Cir. 2005) (quoting *Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir. 1989)).   However, if the claimant is able to "engage in 'extensive daily activities'," the ALJ may use that as evidence to find the claimant is not entirely credible.   *Wagner v. Astrue*, 499 F.3d 842, 851-53 (8th Cir. 2007).   "Daily activities" means the "'activities of daily living,'" not that the activities are necessarily done every single day.   *See id.*, 499 F.3d at 852-53. (recounting claimant's daily activities as regularly performing self-care and household chores, preparing meals "'almost daily,'" driving several times a week and visiting friends a few times a week).   "Acts which are inconsistent with a claimant's assertion of disability reflect negatively upon th[e] claimant's credibility."   *Heino v. Astrue*, 578 F.3d 873, 881 (8th Cir. 2009) (internal quotation marks omitted).   For example, an applicant's ability to handle personal care tasks, perform household chores, drive a car for short distances and engage in other activities weighed against the credibility of applicant and his allegations of disabling pain.   *Gray v. Apfel*, 192 F.3d 799, 804 (8th Cir. 1999).

The ALJ concluded Rollefson had only mild restrictions in his daily living, given that he was able to engage in many activities.   AR 21.   Per his own testimony, Rollefson is able to live independently, perform self-care and household tasks, read, watch television, walk at the YMCA daily, attend bible study at church once a week, shop for

thirty minutes at a time and drive for up to 45 minutes. AR 62-66, 318-30, 342-48. The third-party function reports, discussed above, indicate that Rollefson engaged in other hobbies such as making jewelry, playing video games, attending sporting events and visiting the library. The ALJ found "[Rollefson's] activities are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations" and that Rollefson was "less than fully credible regarding his allegation of total disability." AR 27-28. The ALJ did not err in making this determination. The ALJ properly considered Rollefson's daily activities in finding his subjective allegations to be less than fully credible. *See Gray*, 192 F.3d at 804.

### d. *Precipitating and Aggravating Factors*

Rollefson contends the ALJ erred in failing to consider that "[p]hysical exertion, specifically standing and walking, stress, being around people, dealing with authority figures all increase [his] pain, depression, anxiety and inability to function consistently." Doc. No. 10 at 24. However, the ALJ accounted for many of those very issues in formulating Rollefson's RFC, relying on Rollefson's own testimony and medical evidence. *See* AR 22-25, 54-60. For example, the ALJ limited Rollefson to sedentary work in a less stressful job with no contact with the general public and only minimal contact with coworkers. The ALJ also limited Rollefson to standing for thirty minutes to one hour at a time, which is consistent with Rollefson's own testimony and the work rehabilitation report that noted fatigue after two hours of standing. The ALJ did not err when considering precipitating and aggravating factors in making his credibility determination.

### e. *Dosage, Effectiveness and Side Effects of Medication*

The ALJ properly considered the effectiveness of medication and treatment in assessing Rollefson's credibility. "Impairments that are controllable or amenable to treatment do not support a finding of total disability." *Hutton v. Apfel*, 175 F.3d 651,

655 (8th Cir. 1999). With regard to Rollefson's thyroid condition, the first radioactive thyroid treatment was not effective but a second treatment, in September 2011, was highly effective and brought his thyroid to normal functioning levels. AR 53, 609. The ALJ properly considered and analyzed the evidence concerning the treatment of Rollefson's thyroid condition. AR 25-26.

The same is true with regard to Rollefson's depression medication and treatment. The record supports the ALJ's finding that the switch to Abilify in September 2011 was effective in treating Rollefson's symptoms. Rollefson testified that the medication had made his depression "a little bit better" but that he continued to experience issues with concentration, pace, and memory. AR 51-52. However, the ALJ noted that Rollefson's treating sources all noted improvement in those areas following the change in his medication. AR 27, 574, 576, 578, 584. The ALJ did not err in finding that Rollefson was not fully credible in regards to the lingering severity of his depression.

### f.    *Functional Restrictions*

The ALJ did not err in considering functional restrictions in making his credibility determination. In crafting the RFC, the ALJ relied heavily on Rollefson's own testimony about his physical capabilities. *See* AR 28, 57-59. The ALJ also noted that no treating physicians prescribed any restrictions on Rollefson concerning his physical ability to stand and walk. AR 28, 394, 653. Additionally, Rollefson's alleged functional restrictions were inconsistent with his daily activities. *See Moore v. Astrue*, 572 F.3d 520, 525 (8th Cir. 2009) ("A lack of functional restrictions is inconsistent with a disability claim."). As far as his mental impairments, including concentration, getting along with others and staying on task, the ALJ did consider these restrictions and credited them to some degree in finding Rollefson could handle a lower-stress level, unskilled job and restricting interaction with others.

### g.    Summary

As noted earlier, the ALJ's credibility determinations are entitled to deference if "they [a]re supported by good reasons and substantial evidence." *Cox,* 471 F.3d at 907. For the reasons set forth above, I find that the ALJ's assessment of Rollefson's credibility met this standard. As such, I reject Rollefson's argument for remand on this issue.

### 2.    Consideration of the Vocational Rehabilitation Report

Rollefson next argues that the ALJ failed to properly consider a vocational rehabilitation report from Opportunity Village. He contends that the ALJ "failed to state whether he considered the results or what weight, if any, he gave to these findings." Doc. No. 10 at 29. According to Rollefson, under Social Security Regulations and Social Security Rulings, the ALJ must "evaluate and consider evidence from third parties, including work evaluations." *Id.* He contends that when the results of the report were included in a hypothetical question to the VE, the VE determined Rollefson would not be able to engage in competitive work. Thus, Rollefson concludes if the ALJ had properly considered the vocational report, he would have found him to be disabled. *Id.* at 31.

Social Security Ruling 85-16 recognizes that "[r]eports of workshop evaluation may also be of value in assessing the individual's ability to understand, to carry out and remember instructions, and to respond appropriately to supervisors, coworkers, and customary work pressures in a work setting." SSR 85-16. Thus, the ALJ must use the "[i]nformation derived from workshop evaluations . . . in conjunction with the clinical evidence of impairment, but all conflicts between workshop evaluation evidence and the conclusions based on objective medical findings must be resolved." *Id.* Certainly, "an ALJ may not completely ignore the reasoned opinion of qualified vocational experts in favor of the opinion of a government vocational consultant, particularly when the government expert's opinion is elicited through a hypothetical question that does not accurately reflect the factual record." *Ekeland v. Bowen*, 899 F.2d 719, 721 (8th Cir. 1990) (citing *Jelinek v. Bowen*, 870 F.2d 457, 458, 460 (8th Cir. 1989)).

18

Contrary to Rollefson's contention that the ALJ "simply recit[ed] that an evaluation was done," the ALJ wrote extensively about the findings in the vocational rehabilitation report. *See* AR 24-25. The ALJ fairly and accurately recounted those findings, noting both where Rollefson did well and where he needed improvement. *Compare id. with* AR 381-82. In particular, the ALJ noted Rollefson's overall productivity level of 64.56%, with the highest level of 92.21% in food service, and his quiet but friendly behavior with coworkers, but also referenced the vocational evaluator's concerns about his ability to independently self-direct and complete tasks, and a recommendation that Rollefson work with a job coach to improve communication and motivation. AR 24-25.

The ALJ did not err in considering the vocational rehabilitation report. The ALJ did not completely ignore the report, which would have been reversible error. *See Ekeland*, 899 F.2d at 721. In *Ekeland*, the ALJ did not give proper consideration to the claimant's work evaluation because the evaluation was added to the case file after the hearing, meaning "the vocational expert did not have the benefit of the [work evaluation's] full findings and conclusions regarding Ekeland's employment potential in responding to the ALJ's questions." *Id.* at 722. The Court found the late inclusion of the report "prevented the ALJ from basing his conclusion regarding Ekeland's disability claim on a fully developed record." *Id.* The vocational rehabilitation report in *Ekeland* also clearly showed someone who could not return to substantial, gainful activity even with additional help. *Id.* at 721-22 (noting work evaluation showed Ekeland performed poorly in *all* job skill areas and concluded that he could not be rehabilitated for any kind of competitive gainful employment).

Here, the vocational rehabilitation report was in the record at the time of the hearing and was considered by the VE. AR 79. Moreover, the report demonstrated that Rollefson was able to perform at 92.21% productivity in at least one area (food service), recommended part-time work due to concerns about physical stamina and suggested further vocational assistance to address his communication difficulties would ready him

for competitive employment. AR 25, 382. The ALJ noted that the mental health treatment records showed that Rollefson did, in fact, continue with such vocational assistance. AR 25. The ALJ properly considered the vocational rehabilitation report in evaluating Rollefson's claim for disability.

### 3.      *The Vocational Expert's Testimony*

Finally, Rollefson contends that the ALJ erred in relying on the VE's testimony because the ALJ failed to include all of Rollefson's impairments in formulating hypothetical questions to the VE. In particular, Rollefson contends that the ALJ should have included a need for frequent breaks, a slower paced environment and a higher level of supervision. Doc. No. 10 at 27. Rollefson notes that when the VE was asked hypothetical questions by his counsel that included these alleged limitations, the VE testified that such a person would not be competitively employable. *Id.* at 27; *see also* AR 79-81.

"[T]he ALJ's hypothetical question to the VE must include those impairments that the ALJ finds are substantially supported by the record as a whole." *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996) (citing *Stout v. Shalala*, 988 F.2d 853, 855 (8th Cir. 1993)); *accord Grissom v. Barnhart*, 416 F.3d 834, 837 (8th Cir. 2005). Put another way, the hypothetical question must include "those impairments and limitations found credible by the ALJ." *Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005). The hypothetical question does not need to "'frame the claimant's impairments in specific diagnostic terms used in medical reports, but instead should capture the concrete consequences of those impairments.'" *Buckner*, 646 F.3d at 561 (quoting *Hulsey v. Astrue*, 622 F.3d 917, 922 (8th Cir. 2010)). When a hypothetical question does not include all relevant impairments, the vocational expert's testimony does not constitute substantial evidence. *See Hulsey*, 622 F.3d at 922; *Peterman v. Chater*, 946 F. Supp. 734, 740-41 (N.D. Iowa 1996).

The ALJ posed the following hypothetical question[6] to the VE:

[A]ge 45, a male; he has four years of college, past relevant work as set forth in 27E; lifting 35 pounds occasionally, 15 pounds frequently; sitting two hours at a time for six of an eight-hour day; standing from 30 minutes to an hour at a time for four of an eight hour day; walking half a block; only occasional climbing of ramps and stairs; only occasional climbing of ladders, ropes, and scaffolds; only occasionally stooping, kneeling, crouching, crawling, and bending; would need a low-stress [INAUDIBLE] four, with 10 being the most stress and one being the least; would require a job with no contact with the general public, limited contact with fellow workers; would need to avoid concentrated exposure to noise; also no working at heights. Previously you said no transferable skills. Is that still true?

AR 76-77. The VE responded that with such limitations, Rollefson could not perform his past relevant work but could perform sedentary and unskilled work, such as document preparer, addresser and ticket counter. *Id.* at 77.

The ALJ did not err by failing to include a limitation requiring frequent breaks and a slower paced environment. These limitations reflect alleged impairment in concentration, attention or pace. The ALJ found:

The evidence is consistent and the claim is credible in demonstrating [Rollefson] experienced some decline in functioning with moderate to marked limitations in sustaining attention, concentration, and pace *for a short period of time . . . . However, these limitations were not sustained over a consecutive twelve month period.* Further, evidence shows significant improvement in functioning following treatment for an overactive thyroid and adjustment of psychotropic medications.

---

[6] In his decision, the ALJ referenced his first hypothetical to the VE (AR 30) but clearly meant to reference the *second* hypothetical, as that hypothetical is identical to the RFC finding and the listed job possibilities derive from it as well. *Compare* AR 22, 29-30 *with* AR 75-77. Thus, I have chosen to analyze the second hypothetical posed to the VE. This mistake does not require reversal because a deficiency in opinion writing does not constitute reversible error if it has no bearing on the outcome. *See, e.g.*, *Buckner*, 646 F.3d at 560. It is clear that the ALJ adopted the second hypothetical in its entirety.

AR 27 [emphasis added]. Because the ALJ's finding is supported by substantial evidence in the record, the ALJ was not required to specifically include this impairment in the hypothetical question to the VE.

Nor did the ALJ err in failing to include a highly-supervised working environment as a limitation. Rollefson previously engaged in competitive employment without needing additional supervision. AR 282 (work performance assessment rating Rollefson's performance as "adequate"). However, as part of a vocational rehabilitation evaluation, the evaluators did recommend Rollefson work with a job coach to improve his communication with employers and ability to self-direct, which the ALJ discussed in the opinion. AR 24-25, 382. The ALJ noted that Rollefson had pursued further vocational assistance to work on his communication skills in order to acquire competitive employment. AR 25, 578. As noted above, the ALJ properly considered the work evaluation report and his findings are supported by substantial evidence in the record as a whole. The ALJ did not err in relying on the VE's testimony in response to a hypothetical question that contained only those limitations the ALJ found to be credible.

## VI. CONCLUSION

After a thorough review of the entire record and in accordance with the standard of review I must follow, I conclude that the ALJ's determination that Rollefson was not disabled within the meaning of the Act is supported by substantial evidence in the record. Accordingly, the decision of the ALJ is **affirmed**. Judgment shall be entered in favor of the Commissioner and against Rollefson.

**IT IS SO ORDERED.**

**DATED** this 8th day of September, 2014.

_____
LEONARD T. STRAND
UNITED STATES MAGISTRATE JUDGE